**UNITED STATES OF AMERICA**
 **WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**                                    **21-CR-06123 (FPG)**

      **v.**

**DALE E. TRIMMER**

_____

**SENTENCING STATEMENT AND REQUEST FOR A NON-GUIDELINE SENTENCE**

SONYA A. ZOGHLIN, Assistant Federal Public Defender for the Western District of New York affirms as follows:

I am licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent the defendant, Dale E. Trimmer.

The factual representations made in this Statement are based on investigations by members of my office, including a forensic computer review of the evidence recovered from the electronic devices seized in this case; medical records; conversations with Dale Trimmer, his family members and others; and a review of the Presentence Investigation Report (Dkt. #34 "PSR") and the following exhibits:

| | |
|---|---|
| Exhibit A: | Letter from Carol and Thomas Coburn, Dale Trimmer's neighbors, dated February 28, 2022**;** |
| Exhibit B: | Shirley Anne Trimmer Obituary, dated July 30, 2009; |
| Exhibit C: | Letters from VA Rehabilitation Counselor, Mike Burns, MSW, dated January 24, April 12, and June 14, 2022; |
| Exhibit D: | Anger Management Certificate and Letter, dated December 16 2021; |
| Exhibit E: | Letter from Dale Trimmer, dated July 7, 2022. |

## BACKGROUND AND PROCEDURAL HISTORY

On October 15, 2021, Dale Trimmer pleaded guilty to a single-count Information charging him with attempting to receive child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1). The defense and the government have agreed that the applicable recommended sentencing guideline range is 151 to 188 months.

Mr. Trimmer has reserved the right, however, to argue for a below-guideline sentence. Mr. Trimmer respectfully submits that a below guideline sentence is clearly appropriate under the circumstances of this case and urges this Court to impose the mandatory minimum period of incarceration (5 years), to be followed by a significant period of supervised release. This sentence serves the purposes set forth under 18 U.S.C. §3553(a) and would be "sufficient, but not greater than necessary" to meet federal sentencing goals.

Dale Trimmer also respectfully requests that the Court recommend to the Bureau of Prisons that receive mental health treatment; that he be housed as close to Rochester, New York as possible; and at a facility with a S.O.M.P. (Sex Offender Management Program). Finally, the Court should conclude that he is indigent based upon the information contained in the PSR and not impose the financial penalties outlined in PSR ¶¶ 92-96.

## GENERAL SENTENCING AUTHORITY

Under 18 USC §3553(a), federal sentencing courts must impose a sentence that is *sufficient, but not greater than necessary*, to meet the purposes of sentencing. In other words, if the district court concludes that either of two sentences would properly serve the statutory purposes of §3553(a), application of the parsimony clause compels imposition of the lesser sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). These four purposes of sentencing are:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. §3553(a)(2)(A-D).

The sentencing court must consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 245-246 (2005). The Second Circuit Court of Appeals has made clear, however, that the guidelines are *not* presumptively reasonable. *See United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009); *see also United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) ("we do not presume that a Guidelines sentence is reasonable"). Accordingly, after correctly calculating the advisory guidelines range, a sentencing court must conduct its own independent review of the §3553(a) sentencing factors. *See United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008), *cert. denied* 129 S. Ct. 2735 (2009)) ("Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors").

When applying § 3553(a) and its parsimony clause, a sentencing court must look to the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the Guidelines themselves. *United States v. Dorvee*, 616 F.3d at 183. The importance of individualized sentencing is a central theme in federal criminal law:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

> individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Kimbrough v. United States*, the Supreme Court reminded the district courts that:

> The sentencing judge . . . has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . . . He is therefore in a superior position to find facts and judge their import under § [3553(a)] in each particular case.

552 U.S. 85, 108 (2007) (internal quotations omitted).

In addition to considering the unique circumstances of this case, the Court should also consider the fact that the sentencing guidelines applicable to child pornography cases are uniquely harsh and disproportionate as compared to other serious crimes.

## GROUNDS FOR IMPOSITION OF A NON-GUIDELINE SENTENCE IN THIS CASE

### *Like U.S.S.G. § 2G2.2, § 2G2.1 is fundamentally different from other guidelines and must be applied with great care*

Congress delegated to the Sentencing Commission the discretion and authority to initially formulate the guidelines because "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *Mistretta v. United States*, 488 U.S. 361, 367, 379 (1989). One of the benefits of the Commission was that it provided "some insulation from the distorting pressures of politics" and was in position to monitor, study, and revise the guidelines over time." Frank O. Bowman, III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L.Rev. 1315, 1324 (2005).

In several areas of the guidelines, including those applicable to sex offenses, Congress has

stepped in to direct the Commission's work by its use of increases in mandatory minimum sentences and directives to the Commission that were designed to change sentencing policy. U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72–73 (November 2004) ["Fifteen Year Report"].[1] The Commission itself recognized that "[m]uch like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses." *Id*. Regarding the child pornography guidelines, "[t]he principal or only reason given by the Commission itself for each of the amendments is that the amendment was undertaken exclusively or primarily at the behest of Congress." *United States v. Beiermann*, 599 F.Supp.2d 1087, 1100 (N.D.Iowa 2009); *see also* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 1, 2009).

District courts are empowered to categorically disagree with the guidelines where they "'do not exemplify the Commission's exercise of its characteristic institutional role.'" *Spears v. United States*, 555 U.S. 261, 264, (2009) (per curiam) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). Many courts have recognized that the exercise of discretion with respect to the child pornography production guideline of U.S.S.G. § 2G2.1 is warranted. *See United States v. Price*, No. 09–CR–30107, 2012 WL 966971, at *33-34 (C.D.Ill. Mar. 21, 2012) (noting similar issues with U.S.S.G. § 2G2.1 and downwardly departing); *United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (in child pornography production case noting "[a]nd, perhaps for good reason, the government did not take issue with Huffstatler's premise that the child-exploitation guidelines lack an empirical basis").

---

[1]Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (accessed 11/10/21).

The Second Circuit Court of Appeals, in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), a child pornography distribution case, recognized the struggle sentencing judges encounter when considering the Guidelines range in child pornography cases. The *Dorvee* panel acknowledged that the § 2G2.2 guideline is fundamentally different from most and that, unless applied with great care, could lead to unreasonable sentences inconsistent with the requirements of 18 U.S.C. § 3553. *Id*. at 184. The *Dorvee* panel noted that the § 2G2.2 guidelines are not based upon empirical data derived from past sentencing practices. Instead, the Guideline was amended several times at Congress' direction recommending harsher penalties. *See Dorvee*, 616 F.3d at 184 – 185.

In her dissent in *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting), Judge Pooler pointed out that the U.S.S.G. § 2G2.1 production guideline at issue here suffers from the same methodological flaws as the U.S.S.G. § 2G2.2 guideline at issue in *Dorvee*:

> Although Dorvee did not produce child pornography, much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses "usually as a result of congressional directives." *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 249 (2012).

*United States v. Brown*, 843 F.3d at 89.

Here, because the guideline for the substantive offense of conviction (Attempted Receipt of Child Pornography) contains a cross reference to U.S.S.G. §2G2.1 (based on the originally charged conduct), the base offense level for the crime of conviction in this case is 32. This base offense is increased by four levels for two "specific offense characteristics," the ubiquitous enhancement for "use of a computer" and another for the purported age of the fictitious teenager

(between 12 and 16), resulting in an offense level of 36. Even after a reduction for acceptance of responsibility, Dale's guidelines of **151 to 188 months (12 years 7 months to 15 years 8 months)** are significantly out of proportion to the offense he committed.  As noted above, this guidelines range is a product of a series of Congressional directives and not by the use of the Commission's empirical approach.

As the Supreme Court has repeatedly emphasized: "'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). And where, as here, the guidelines no longer provide any guidance, it is incumbent on the sentencing judge to provide a thorough discussion of the § 3553(a) factors and how they relate to the ultimate sentencing decision.

That the crime Dale Trimmer committed is serious and warrants punishment is clear. Considering all of the facts of this case in light of the § 3553(a) factors, however, the Court should reject the sentencing guidelines and impose the mandatory minimum sentence of 5 years' imprisonment, which is sufficient but not greater than necessary to serve the statutory purposes of sentencing.

## THE NATURE OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### *The Nature of the Offense*

Despite the words exchanged during Dale Trimmer's fantasy relationship with an undercover federal agent posing as a teenage girl, and their tentative plans to meet in person on several occasions, it is undisputed that these meetings never occurred. *See* PSR at ¶52. This turn

7

of events was not simply fortuitous; the meetings didn't happen because Dale Trimmer didn't want them to. Over the course of nearly three months, Dale Trimmer and the agent exchanged thousands of messages, many about benign topics like the agent's purported conflicts with her mother, Dale's job, jigsaw puzzles, and his dog, Connor. During that time, they made plans to meet in person three times. On each occasion, Dale manufactured an excuse to cancel the meetings, despite the agent's encouragement.

The day before the first planned meeting on January 14, 2021, Dale suddenly paused their usual conversation. The FBI agent texted: "Did I do something wrong???" Dale responded that he had "spiked a fever" and gone to the emergency room. After further discussion of his "illness" on January 13th, Dale texted on January 14th that he was on his way home from the emergency room again, later reporting that he had tested positive for COVID and had to quarantine. *None of this was true*. Dale wasn't sick and had not gone to the hospital. The next planned meeting was February 5, 2021. Earlier that day, Dale texted that the night manager at Price Rite was "gonna b late" and he would have to stay until 6:00. The agent responded, "RLLY?? Sooo wut does that mean about tonight??? R u not gunna come?" Dale answered, "I would have to say prolly not at this point I'm sorry baby." The agent complained, "I dnt feel like u r ever gunna come." Dale texted back, "That's not true at all…I know ur mad at me..and it's out of my control." This, too, was not true; Dale was not working late that day.

The last meeting was planned for February 12, 2021. The agent agreed that she would pretend she was sick and stay home from school so they could get together. When the day arrived, however, Dale (falsely) reported that he had been up all night with his sick puppy. He texted, "Go to school…Cuz I'm prollly gonna be at vet/animal hospital dealing w him." The agent and Dale continued to exchange messages throughout the day about the puppy's purported visit to the vet

and the plans to get together. At one point, the agent texted, "Okay I'm gunna hop in the shower text me when free to come over." As the day progressed, Dale reported that his puppy was not doing well, and the agent continued to inquire about his plans to come over and express "her" disappointment:

- "I guess Connor [the dog] is ur first luv and I'm a very very very far behind;"

- "It just seems like it's never gonna happen;"

- "There was all this build up and then nothing...For a second time."

- "So ur not coming today right??? Cuz I might just leave and go for a walk or something…I need to clear my head  I'm so upset."

- And, finally, the agent added, "It's fine I'm used to being all alone and by myself. I was so excited for a valentines gift. Now I just feel single and alone and worthless."

Dale Trimmer's actions repeatedly belied his stated intention to meet his virtual "girlfriend" in person. As noted in the PSR, each time the date for the meeting was imminent, Dale provided an excuse to avoid it; *none of these excuses were true*: he didn't have to work late; he didn't go to the Emergency Room or have COVID; and his puppy wasn't sick. Indeed, FBI agents who controlled the text conversations ultimately decided to conclude their investigation with an arrest rather than wait any longer for him to follow-through with a meeting.

During an interview with Special Agent Barry Couch after Dale's arrest, they had the following exchange about the failed meetups:

| Agent Couch: | It looks like you guys tried to meet up in the not too distant past, were making arrangements to meet up and have sex. It looks like you didn't meet up with her. Did you just get cold feet? Why didn't that go down? |
|---|---|
| *Dale Trimmer:* | ***"Because realizing what was happening was not…was wrong."*** |
| Agent Couch: | Were you concerned law enforcement would show up? |
| *Dale Trimmer:* | *Yes, that, but more I want to get to the root of why…I guess more* |

> *the help, needing the help of getting, for the cause of why I'm feeling this, or occasionally feeling this way.*

*See* PSR at ¶¶54.

None of these failed attempts to get together excuse Dale's explicitly sexual communication with someone he believed to be a teenage girl, nor his brief requests that she send him photos. Nor does his pattern of making up excuses to avoid meeting in person explain why he bought gifts he said were intended for her. Whether the gifts were part of his elaborate fantasy, or whether he actually thought he would deliver them, when it came time to appear for their meetings, he balked. As he explained to Agent Couch, he realized what was happening was wrong. Though Dale apparently lacked the strength of character to end the texting relationship he had come to rely on, he successfully resisted taking the next step into a much more serious offense. The Court should consider that mitigating factor in determining the appropriate sentence in this case.

### Dale's Work History, Military Service, and Volunteer Activities

Just after his 20th birthday, Dale enlisted in the United States Navy with the expectation of serving his country and training for a career in aviation. A complicated dispute with a fellow airman over his affair with Dale's wife, and Dale's resulting depression, led to his honorable discharge from the Navy after serving 17 months. Despite this set back, Dale quickly embarked on what would become a long history of honest employment. *See* PSR at ¶¶109-114.

Dale is a hard worker and diligent employee. He was consistently employed from the age of 22, when he left the Navy, until his incarceration six years later. During this time, he also earned his EMT certificate and volunteered for the East Rochester Ambulance Corps. See PSR at ¶115. Immediately after his release from prison in October 2008, and despite the stigma of a conviction for a sex offense, Dale secured a job as a receiver at Price Rite when he was 33 years old. He worked consistently in this position for more than 12 years, right up to the day of his arrest for the

instant offense. While working at Price Rite, he diligently contributed to the household he shared with his wife, Tammy, and her two adult children. As his former neighbors, Thomas and Carol Coburn, attest, Dale was a proud veteran and good neighbor. *See* Exhibit A.

### *Dale's Childhood*

Although Dale always had a roof over his head and food on the table as a child, he did not have a loving or supportive childhood. He was the only child of Gene and Shirley Trimmer. His father worked at Xerox and the family lived in Macedon. His parents, Gene and Shirley, were miserable together and created a tense, unhappy home life throughout Dale's childhood.  While their disdain for each other did not result in yelling and screaming, their behavior was almost worse - they gave each other the silent treatment. Within their small, 1500 square foot house, Dale's parents would go weeks without speaking to each other. Dale recalls the longest period of silence being seven weeks when he was only eight years old. While Gene and Shirley's hostility was directed at each other, their behavior had a profound effect on their son, who was the only other member of the household. At a time when Dale should have been running around the house being loud, carefree and joyful, he remembers "walking on eggshells" in his parents' presence. His parents ostracized each other and did the same to their son.

In "The Psychology of the Silent Treatment," Princeton University psychology professor Joel Cooper identifies the effects of silence within a family: "Because we humans require social contact for our mental health, the ramifications of isolation can be severe. In the short term, the silent treatment causes stress. In the long term, the stress can be considered abuse."  *See,* Austin, Daryl, "The Psychology of the Silent Treatment," The Atlantic, March 26, 2021, https://www.theatlantic.com/family/archive/2021/03/psychology-of-silent-treatment-abuse/618411/, last accessed July 5, 2022; *see also* Dastagir, Alie E. "'I felt as if I was dead to

her': The psychological cost of the silent treatment." Democrat & Chronicle, April 7, 2022; https://www.democratandchronicle.com/story/life/health-wellness/2022/04/07/silent-treatment-how-its-defined-when-its-abuse-and-how-deal/9492221002/, last accessed July 5, 2022. Dale lived in this environment throughout his childhood.

Well after Dale was an adult and had moved away, his parents began the process of a long overdue divorce. Tragically, however, before the divorce was finalized, Dale's mother died of Chronic Obstructive Pulmonary Disease (COPD) on July 27, 2009. She was only 59 years old. Her husband, Gene, was not mentioned in her obituary. *See* Exhibit B, Shirley Anne Trimmer Obituary. Dale's father is retired and living in Pennsylvania. Despite encouragement from Dale's former wife, Tammy, Dale's father has shunned his son.

In addition to the stress Dale experienced at home, he suffered merciless taunting from his peers during his school years and stares from strangers throughout his life due to a large "port-wine stain" birthmark on his face. A port-wine birthmark, or "stain" (PWS), is a congenital capillary malformation that is initially found in newborns. The stain first appears as pink or red but darkens to a reddish purple and grows proportionately with age. *See,* https://www.mayoclinic.org>birthmarks>sils-20076683. As a result of this prominent, facial abnormality, Dale was excluded by his classmates and shunned by potential romantic partners. His self-esteem was non-existent and his loneliness, at school and at home, was unrelenting.

The psychological effects of port-wine stains on affected individuals' quality of life was discussed in a recent review of medical literature published in the journal Clinical, Cosmetic and Investigational Dermatology. *See* Wanitphakdeedecha, R; Ng, JNC; Yan, C; Manuskiatti, W; Sudhipongpracha, T; Jantarakolica, T. "Quality of Life and Psychological Effects of Port-Wine Stain: A Review of Literature." Clin Cosmet Investig Dermatol, 14:681-690, 2021 Jun 22,

available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8235992/, last accessed July 5, 2022. Not surprisingly, the review found that individuals with port wine stains suffer significant psychological disabilities. While few disabilities were found in pre-school children, once a child with PWS began interacting with their peers in school and other social settings, their quality of life suffered as they were frequently ostracized by their peers.

Compared to grade school children, however, adolescents and adults with PWS showed much greater negative consequences among their social contacts. Many adults believed their skin condition caused them to be treated differently by their peers and impaired their ability to attract potential romantic and sexual partners. *Id*. Dale's port-wine stain doesn't excuse his conduct. It does, however, shed light on his low self-esteem and the challenges he's experienced forming satisfying, long-term relationships with other adults. Though the sexual nature of his online relationship with the agent whom he believed to be a teenager (named Emily) is entirely inappropriate, his desperation for companionship, acceptance, and a meaningful relationship is apparent throughout their exchanges. Indeed, the ruse used by Special Agent Couch to engage Dale in conversation was that "Emily" had "disappeared last night" and her family had asked law enforcement to look for her, successfully capitalizing on Dale's misguided concern for "Emily." Dale dutifully reported that she told him she had an argument with her mom and he had counseled her not to run away.[2]

### Dale's Failed Relationships

Dale has had three significant romantic relationships, all of which ended in separation or divorce. Soon after graduating from Palmyra Macedon High School in 1993, Dale married Rhonda Spencer. That same year, Dale and Rhonda moved to Florida and Dale joined the Navy, enlisting

---

[2] In reference to an early argument the agent reported to Dale, he texted, "And whatever u do DON'T RUN away either."

as an E-2 Airman Apprentice. His duties included repairing and maintaining aircraft and aircraft equipment in preparation for flight operations. He was stationed at Cecil Field, a naval air station in Jacksonville, Florida, and traveled to the Red Sea during the first Gulf War. While he was away, Dale learned that Rhonda had become pregnant with a fellow airman's child and ultimately miscarried. He was crushed by this revelation and betrayal and sunk into a deep depression.

After his discharge from the Navy in 1996, Dale and Rhonda remained married and returned to Western New York. They went on to have two children together, a son, Zachary, and a daughter, Courtney. Zachary was born with Down Syndrome and lives in a group home. Dale and Rhonda divorced in 2001 after six years of marriage. Rhonda subsequently remarried and her new husband, Scott Remmel, adopted Dale's children, further fracturing his relationship with them.

Following his divorce from Rhonda, Dale entered a relationship with Stacey Hawkins. Dale and Stacey had two children, Elliott and Gabriel. After their relationship ended in 2008, however, Dale was prevented from seeing his children and has never been able to establish a meaningful relationship with them. Nonetheless, Dale faithfully paid child support until he was incarcerated for this offense and became unable to keep up with his financial obligations to them.

In 2010, Dale married Tammy Proctor. For the next 11 years, they lived together, along with Tammy's adult children, in their Spencerport home. According to Tammy, though life with her children was challenging at times, Dale remained supportive of all of them and a steadfast contributor to the family's finances. Following Dale's arrest in February 2021, however, Tammy filed for divorce. She explained that remaining married to him and concerned about his well-being in prison was more than she could bear.

14

### *Dale's Mental Health*

Understanding Dale's history of emotional abuse at the hands of his parents, his lack of self-esteem, and his struggles with relationships, it is not surprising that Dale suffers from depression and anxiety. Both have been ongoing issues for Dale since his young adulthood, though the only counseling he received before his most recent incarceration consisted of 2-3 sessions over 17 years ago. *See* PSR at ¶104. During his annual check-up on January 6, 2021, six weeks before his arrest, his doctor found him to have continued anxiety and depression along with hypertension. Dale was prescribed Duloxetine for depression and hydrochlorothiazide and Losartan for high blood pressure. He sought mental health treatment shortly after his incarceration in February 2021 and is currently prescribed Cymbalta to manage his anxiety. *See* PSR at ¶105. Through his involvement with the veteran's dorm at the Monroe County Jail, Dale has a renewed appreciation for his mental health issues and his need for ongoing treatment.

### *Dale Has Successfully Begun the Rehabilitation Process*

Looking back on his life, Dale wishes he had received counseling as a child.  He wishes he had told someone about the depression and anxiety he has always felt. Fortunately for Dale, while incarcerated for the last 17 months, he has found a valuable resource. Because he is a veteran of the United States Navy, Dale was placed in the "Veteran's Unit" at the Monroe County Jail. As part of this unit, Dale "regularly attends and actively participates" in group sessions addressing a wide range of topics including anger management, veterans and incarceration, and seeking self-worth and security. *See* PSR at ¶105. Dale takes advantage of every opportunity for self-improvement, attending 2-hour group sessions every weekday. At this point, Dale estimates he has participated in 560 hours of these sessions since his incarceration.

During these meetings, which are facilitated by VA Rehabilitation Counselor, Mike Burns,

participants can express their emotions, get substantive feedback on various topics, and learn tools to cope with negative emotions. Mike Burns reports that Dale "always attends and participates in groups;" does "very well on the Unit;" "is very engaged" in group sessions; and "[h]e has learned to open up and share/become an integral member of the discussion and has grown as a person!" *See* Exhibit C, Letters from VA Rehabilitation Counselor, Mike Burns, MSW, dated January 24, 2022; April 12, 2022; and June 14, 2022; *see also* Exhibit D, Letter from Sabra Hickam, Educational Coordinator, Monroe County Jail, dated December 16, 2021 and "Certificate of Completion." Dale also reports that he has gained much needed support and perspective from his participation in the veterans' group and is very grateful for the opportunity to participate. *See* Exhibit E.

Most recently Dale was able to share in a group meeting for the first time in 35 years that he had been sexual molested by a babysitter when he was 12 years old. Dale has also shared this traumatic incident in his letter to the Court. *See* Exhibit E (Letter from Dale Trimmer). As a child Dale was confused by the woman's actions and chose not to share it with anyone. With the help and trust of the MCJ Veteran's Group, Dale feels he has taken a giant step towards healing and thus bettering himself.

### *The BOP Cannot Provide the Mental Health Counseling and Medication that Dale Needs and is Eager to Receive*

Within the BOP, inmates diagnosed with mild to moderate depression are to be managed "without psychiatric consultation, unless extenuating circumstances arise." *See* Management of Major Depressive Disorder, Federal Bureau of Prisons Clinical Guidance, May 2014 (Reformatted October 2017), at p. 8, available at https://www.bop.gov/resources/pdfs/depression.pdf, accessed 11/11/21. Over the years, the BOP has struggled to provide its mentally ill inmates with appropriate care and treatment. As of midyear 2005, it was estimated that 45% of federal prisoners suffered

from a mental health problem. *See* "Mental Health Problems of Prison and Jail Inmates," *Bureau of Justice Statistics Special Report*, September 2006, at p. 1, available at http://www.bjs.gov/content/pub/pdf/mhppji.pdf, accessed 11/11/21. Only 24% of these federal inmates actually received mental health treatment while in federal prison. *Id*. at 9. By way of contrast, mentally ill inmates serving state prison sentences had the highest rate of receiving mental health treatment while incarcerated - more than federal prisoners or even those detained in local jails; on average, 34% of mentally ill state inmates received mental health treatment. *Id*.

More than ten years later, in 2016, the U.S. Department of Justice Office of the Inspector General reported that the Federal Bureau of Prisons "was operating at an 83 percent medical care staffing level. . . [a]s a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution." *See* Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Office of the Inspector General, U.S. Department of Justice, March 2016, at p. 7, available at https://www.oversight.gov/sites/default/files/oig-reports/e1602.pdf, accessed 11/11/21. The Inspector General also concluded that the BOP lacked a strategic plan for addressing these staffing problems:

> The BOP has not been proactive about using PHS [U.S. Public Health Service] officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs. Institution staff further told us that lengthy vacancies are common. For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.

*Id*. at 21. The report identified vacant medical positions, one for one year, one for two years, and another for five years. *Id*. at 21-22. The report confirms that the BOP "employs relatively few psychiatrists…" Indeed, in November of 2015, the BOP employed only 25 psychiatrists. *Id*. at 14 and n. 39. As of the time of the issuance of the report (March 2016), the BOP was responsible for

17

192,170                    federal                    inmates.                    *See*

https://www.bop.gov/about/statistics/raw_stats/BOP_pastPopulationTotals.pdf, last visited March

26, 2021. This number corresponds to one psychiatrist for every 7,686 inmates. The report notes

that psychiatrists – as compared to general physicians - have not found the salary lucrative enough

to agree to work for the BOP. *See* Review of the Federal Bureau of Prisons' Medical Staffing

Challenges, Office of the Inspector General, U.S. Department of Justice, March 2016 at 13. In one

instance, when the facility had difficulty filling a psychiatrist vacancy, the position was reallocated

to a different institution. *Id*. at 17.

Dale's mental health issues will almost certainly not be considered sufficiently dire to

warrant consistent and substantive mental health treatment and appropriate medication. It is for

this reason that we ask the Court to recommend to the BOP that, while imprisoned, he receives

mental health treatment. That request, along with a recommendation from the Court to the BOP

that Dale be designated to a facility that has a sex offender management program (SOMP) so that

he has access to sex offender treatment while imprisoned, will significantly aide in Dale's

rehabilitation. This recommendation will also increase the likelihood that he is housed with

individuals convicted of similar offenses and, thereby, reduce his risk of being physically and

sexually abused within the BOP.

### *The Plight of Sex Offenders in the BOP*

Despite being housed in the "Veterans' Dorm" while incarcerated at the Monroe County

Jail, Dale has been subjected to taunting and name calling as a result of being charged with a sex

offense. He has been labeled a "baby raper," "scum," and "pedophile." He has been threatened

and literally backed into a corner while being enticed to fight by other inmates. Sadly, these

conditions are likely to become even more treacherous for Dale as a sex offender in federal prison.

18

To protect themselves from assault in prison, sex offenders imprisoned within the BOP can request to be housed in solitary confinement. Although this solution addresses personal safety concerns within the prison, the resulting isolation can be psychologically devastating. Long term solitary confinement is associated with "the decrease in the size of the hippocampus, the brain region related to learning, memory, and spatial awareness. . . a decrease in the formation of new neurons, and the eventual failure in hippocampal function. On the other hand, the amygdala increases its activity in response to isolation. This area mediates fear and anxiety, symptoms enhanced in prisoners in solitary confinement." *See,* Elena Blanco-Suarez, Ph.D., The Effects of Solitary Confinement on the Brain, *Psychology Today*, 2/27/2019, available at https://www.psychologytoday.com/us/blog/brain-chemistry/201902/the-effects-solitary-confinement-the-brain, accessed 11/11/21. Unfortunately for inmates like Dale, the BOP is simply not capable of providing safe, supportive, housing and treatment on any long-term basis. The less time Dale spends incarcerated within the Bureau of Prisons, the sooner he can get the consistent psychological counseling and support that he so desperately needs.

### *Dale is Remorseful*

From the outset of this case when he was first interviewed by law enforcement, Dale has acknowledged his responsibility for his conduct, expressed remorse, and noted his desire for mental health treatment. Dale has enthusiastically and diligently begun his road to rehabilitation by participating in every group session offered by the veterans' group in his dorm at the Monroe County Jail, where he has reiterated his feelings remorse for this crime. *See* Exhibit C (Letter from Mike Burns dated April 12, 2022). Dale has also expressed his acceptance of responsibility for this offense and his genuine remorse in his letter to the Court. *See* Exhibit E.

At 47 years old, there is plenty of time for Dale to continue his progress after serving his

sentence, engaging in treatment, and being closely supervised by federal probation. Dale needs this help sooner rather than later. The minimum sentence of five years is a significant consequence that nonetheless acknowledges his progress and provides him with the opportunity to continue that journey.

## CONCLUSION

For all of these reasons, Dale Trimmer respectfully requests that this Court consider his history and characteristics, the trauma he experienced as a child, his work history, his need for mental health treatment, and the remorse and acceptance of responsibility he has sincerely expressed, and impose the mandatory minimum sentence of five years to be followed by a significant period of supervised release, a sentence that is both sufficient and not greater than necessary to serve the purposes of sentencing under 18 U.S.C. §3553(a).

Dated:   July 8, 2022

To:     Kyle P. Rossi, AUSA                    */s/Sonya A. Zoghlin, Esq.*
        Jennifer L. Fish, USPO                 Assistant Federal Public Defender
                                               Federal Public Defender's Office
                                               28 East Main Street, Suite 400
                                               Rochester, New York 14614
                                               (585)262-6201
                                               Sonya_Zoghlin@fd.org
                                               Attorney for Dale Trimmer